**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**vs.**                                         **CR. No. 08-1841 JP**

**JULIO E. LOPEZ-MERIDA,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER

On July 1, 2009, Defendant filed Defendant Julio Lopez-Merida's Motion To Suppress (Doc. No. 64) drug and non-drug evidence seized from a tractor trailer rig. On September 14, 2009, a hearing was held on Defendant's Motion to Suppress. Assistant United States Attorneys Ken Gonzales and Joel Meyers represented the Plaintiff at the hearing. Defendant was personally present at the hearing and was represented by attorney Phillip G. Sapien. Defendant is charged with violating 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), possession with intent to distribute more than 100 kilograms of marijuana and 21 U.S.C. § 846, conspiracy.

Having heard the testimony of the witnesses and having considered the exhibits, pleadings and arguments, the Court makes the following:

FINDINGS OF FACT

I.  Factual Background Related To Standing

On August 2, 2008, at approximately 11:50 a.m., New Mexico State Police Officer Arcenio Chavez, who had been a state police officer for nine years, pulled over a tractor trailer rig on Interstate 40 at mile marker 141.  Officer Chavez pulled the rig over because he observed loose brake hoses between the tractor and the refrigerator trailer that violated state and federal

1

safety laws and regulations.  At the time of the stop, Defendant was driving the tractor, and Gil Manfredo Ruiz, the co-driver, was riding as a passenger. Approximately ninety four minutes later, Officer Chavez and New Mexico Motor Transportation Division ("MTD") Officer Joshua Perea discovered boxes containing more than 100 kilograms of marijuana in the trailer. Defendant and Mr. Ruiz[1] were arrested, and the tractor trailer was impounded.

On August 5, 2008, DEA Agent Erin Croft interviewed Mr. Franklin Melendez, owner of Aries Trucking, who claimed possession of the impounded trailer and Mr. Eblin Lopez d/b/a Gavilanes Trucking, who claimed possession of the impounded tractor. The interviews were conducted in Spanish by Officer Hugo Munoz, who translated for Agent Croft.  Mr. Eblin Lopez produced a title to the tractor. Mr. Melendez claimed that he borrowed the tractor from Mr. Eblin Lopez and leased the trailer from Mr. Vincente Guevara, a truck paint shop owner in California. Mr. Melendez stated that he hired Defendant to drive the tractor trailer and that Defendant had been his employee for about a month.

The next day, Mr. Melendez met again with DEA agents and produced a lease-purchase document dated November 8, 2006 for the trailer which showed Mr. Carmelo Moran as the lessor-seller and Mr. Vincente Guevara as the lessee-purchaser. (Ex. 38.)  After Mr. Melendez produced the Moran-Guevara lease-purchase agreement and after Mr. Melendez and Mr. Eblin Lopez signed a Secured Party Indemnity Agreement, Agent Croft released the tractor and trailer to Mr. Melendez and Mr. Eblin Lopez. (Ex. 36.)  Mr. Melendez, however, did not provide written proof that he had leased the trailer from Mr. Guevara, and at the hearing on the Motion to

---

[1] Mr. Ruiz entered a plea of guilty to possession with intent to distribute more than 100 kilograms of marijuana and conspiracy.  21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846. On May 13, 2009, Mr. Ruiz was sentenced to 60 months imprisonment (Doc. No. 58).

Suppress, Defendant presented no testimonial or documentary proof of a lease between Mr.

Guevara as lessor and Mr. Melendez as lessee.

At the end of the hearing on the Motion to Suppress, the Court requested additional

information from Defendant regarding his standing to challenge the search of the trailer. On

October 8, 2009, Defendant filed Defendant Julio Lopez-Merida's Motion To Supplement The

Record Regarding The Suppression Hearing Held On September 14, 2009 (Doc. No. 82) (the

"Motion to Supplement").[2] The government filed a responsive brief (Doc. No. 84).  On October

23, 2009, Defendant filed his Reply to United States' Response to Defendant Julio Lopez-

Merida's Motion To Supplement the Record (Doc. No. 85).   In the Motion to Supplement,

Defendant's counsel states that after the September 14, 2009 hearing he attempted

unsuccessfully to contact Mr. Melendez and Mr. Eblin Lopez.  Defendant's affidavit, attached to

the Motion to Supplement, states the basis for his belief that he had lawful possession of the

tractor trailer unit:

> I was contracted to drive a load of produce by Eblin Lopez. . . Eblin Lopez directed me
> where to pick up the tractor-trailer. . . I believed that Eblin Lopez had authority to grant
> me possession of the tractor-trailer.

(Mot. To Suppl. Ex. A ¶¶ 2-4.)  The Defendant contends that this affidavit along with the

pleadings, evidence and testimony of record are sufficient to establish that Defendant had a

legally recognizable expectation of privacy in the trailer.

Defendant's affidavit testimony, however, contradicts the information given to Agent

---

[2] Because the Motion to Supplement was filed in response to a request by the Court for
supplemental argument, the Court will treat it as a brief and not as a motion.

Croft by Mr. Melendez and Mr. Eblin Lopez.  Agent Croft testified as follows:

> Q.  And you were advised during your interview of these men that Mr. Lopez-Merida had been contracted to drive the truck.  Is that right?
> A.  According to Mr. Melendez, Mr. Lopez[-Merida] worked for him, yes, he had given him the truck to drive.

(Tr. 6:3-7.) [3]

> Q.  Now, going back to August 5 when you [Agent Croft] met with Mr. Melendez, did you ask him or did he tell you anything with regard to when specifically he said he gave the trailer to Mr. Julio Lopez-Merida?
> . . .
> A.  He stated that he gave the truck to Mr. Lopez-Merida on the 29th of July.

(Tr. 19:16-25.)

 No evidence, other than the Moran-Guevara lease-purchase agreement and Mr.

Melendez's statements to Agent Croft, was presented showing that either Mr. Melendez or Mr.

Eblin Lopez owned or had the legal right to possess the trailer.

II.  <u>Factual Background Related To The Search And Seizure</u>

Officer Chavez stopped Defendant after he observed loose brake hoses between the

tractor and trailer.  Officer Chavez turned on the video recorder in his police car and recorded

the stop. Exhibit 1, the video, and Exhibit 1A, the video log, were admitted into evidence at the

hearing.  Officer Chavez believed that the loose hoses were a violation of N.M. Stat. Ann. § 65-

3-8, which requires that all safety-related parts on tractor-trailer rigs must be ". . . properly

distributed and secured." N.M. Stat. Ann. § 65-3-8 (2003).  After advising Defendant of the

reason for the stop and showing Defendant the loose hoses, Officer Chavez asked for

---

[3] The Report of Investigation states,
> MELENDEZ stated that Julio Lopez, (the driver who was arrested) was his driver hired by him and has been for approximately one (1) month.

Rept. Invest. at 26 (Mot. To Suppress Ex. A.)

Defendant's driver's license, vehicle registration, bill of lading and log book. Defendant produced a California commercial driver's license and the other documents.

Officer Chavez noticed that Defendant had recorded in his log book that he was off duty on July 27 through August 1, 2008; however, the bill of lading showed that the cargo of cantaloupes had been picked up on July 30, 2008. (Exs. 5 and 6.) Defendant told the officer that another driver had picked up the load, but he did not know the name of the other driver or where the load had been picked up.  On the bill of lading, the signature of the person who picked up the load is illegible, and the signature is not the same as Defendant's signature.  Officer Chavez noticed that the bill of lading showed that the load was supposed to be delivered to Schenectady, New York, but Defendant recorded in his log book that Columbus, Ohio was his destination. (*Id.*)

When asked about his travel plans and cargo, Defendant told Officer Chavez that he was coming from "New York" and that he was hauling "watermelons."  Officer Chavez mentioned the log book destination and Defendant said, "Yeah, New York, but the route is Columbus." Defendant indicated that he only spoke a "little English." (Exs. 1 and 1A.)  Officer Chavez noticed that Defendant appeared nervous and that Defendant's hands were shaking when he was holding his cell phone.

Officer Chavez then approached the co-driver Mr. Ruiz, who was sitting in the passenger's seat of the tractor.  Officer Chavez asked for his driver's license and log book.  Mr. Ruiz had recorded in his log book that he was off duty from July 27 through August 1, 2008. (Ex. 7.)  Officer Chavez asked Mr. Ruiz where he and Defendant obtained the load, and Mr. Ruiz responded that they picked up the tractor trailer parked on a street in Verno, California, but he did not know who originally had picked up the load.  Mr. Ruiz told Officer Chavez that they

5

were taking the load to Columbus, Ohio, which corresponded with entries in Mr. Ruiz's log book but conflicted with the bill of lading destination of Schenectady, New York. (Exs. 5 and 7.) Officer Chavez asked Mr. Ruiz if he had a key to the trailer, and Mr. Ruiz retrieved the key from the passenger's side door and gave the key to Officer Chavez.

About ten minutes after the stop was initiated, Officer Chavez requested assistance from another officer. Approximately twenty minutes after the initial stop and about one minute after Officer Chavez obtained the key to the trailer, Officer Perea arrived on the scene.[4] Officer Chavez informed Defendant and Mr. Ruiz that Officer Perea was going to inspect the rig. Officer Chavez turned over all the paperwork to Officer Perea and briefed Officer Perea on his observations from the truckers' paperwork and statements.

Officer Chavez finished writing a warning citation for the loose hoses and suggested that Defendant tie up the hoses with a bungee cord. (Ex. 8.) Officer Chavez asked Defendant if he was ill because Defendant appeared sick and about to vomit. Defendant answered "yeah." (Ex. 1 and 1A.)

While Officer Chavez completed the citation, Officer Perea did a walk around inspection of the rig and noticed that an opening on the rear door of the trailer, called the "doggy door," had old seals covering the vents. Officer Perea considered this unusual because certain loads, especially produce loads, would require the vents to be open and unsealed. In addition, drivers

---

[4] Officer Perea had been with the New Mexico MTD for about two years. Officer Perea had been an officer in the Los Lunas, New Mexico Police Department for nine years prior to joining the New Mexico MTD.

of refrigerated loads like this one usually keep the vents open.[5]  Officer Perea also noticed that

the temperature gauge showed that the internal temperature of the trailer was 22 degrees

Fahrenheit, but the bill of lading specified that the temperature should remain between 33 and 36

degrees Fahrenheit. (Ex. 5.)

Officer Perea approached Mr. Ruiz, who was still sitting in the passenger's seat.  Officer

Perea asked Mr. Ruiz for his log book and noticed that Mr. Ruiz's log book showed he was off

duty on the day the cargo was loaded, which the officer found suspicious.  Officer Perea asked

Mr. Ruiz where they were going, and Mr. Ruiz told him they were going to New York, contrary

to what Mr. Ruiz had just told Officer Chavez about going to Columbus, Ohio.

Officer Perea next approached Defendant, who was standing behind the trailer.  Officer

Perea looked at Defendant's log book and found it suspicious that Defendant's log book showed

Defendant also was off duty on the day that the trailer was loaded.  Officer Perea then asked

Defendant if he had picked up the load.  Defendant responded "little English." Officer Perea

advised Defendant that he was going to give Defendant an English language test because he is

required to understand and speak a certain amount of English to drive a commercial vehicle. (Ex.

1.) [6]  As part of the test, Officer Perea asked Defendant where he was coming from, and

Defendant responded "New York."  Officer Perea asked Defendant where he was going, and

---

[5] Officer Perea testified, "depending on what they are hauling food-wise, produce-wise, sometimes the shipper is required to leave [the doggy door] open so they can circulate air."  (Tr. 120:1-3.)

[6] *See* Exhibit 10A, 49 C.F.R. § 391.11(b)(2) (requiring drivers of commercial motor vehicles in interstate commerce to be able to read and speak English sufficiently to converse with the general public, to understand traffic signs and signals in English, to respond to official inquiries, and to make entries on reports). Section 391.11(b)(2) has been adopted by New Mexico as part of its trucking regulatory scheme. N.M. Admin. Code tit. 18, Ch. 2, Part 3.

Defendant responded "I don't understand."  Officer Perea asked Defendant what time he had

started driving that day and how many hours he had been driving that day, but Defendant's

response is unclear on the video recording (Ex. 1), and Officer Perea did not record the response

in his written report.  Officer Perea asked Defendant what was in the trailer, and Defendant

responded "watermelons, melones."  Officer Perea asked Defendant who he was working for,

and Defendant replied "Arias Trucking."  When asked, Defendant gave Officer Perea a

telephone number for the trucking company.  Although Defendant was unable to write down the

place where he had picked up the load, Defendant told Officer Perea that he personally filled out

his log book and that he writes a little English. In Defendant's log book, however, the destination

of "Columbus, Ohio" suspiciously was clearly printed.  Officer Perea determined that Defendant

failed the English test and told Defendant that he would be placed "out of service," which meant

that Defendant would not be allowed to drive a commercial vehicle until he passed the English

test. Officer Perea also noted that Defendant had failed to record the previous seven days in his

log book as required by law.

Officer Perea gave Mr. Ruiz the same English test and determined that Mr. Ruiz passed

the test.  Officer Perea, however, indicated that Mr. Ruiz would be placed out of service for ten

hours because he had not recorded the previous seven days in his log book.

Officer Perea returned to his vehicle accompanied by Officer Chavez. While Officer

Perea prepared his inspection report, the officers privately discussed for about twelve minutes

the confusing and suspicious information they had obtained from both Defendant and Mr. Ruiz.

Officer Perea testified that while in his vehicle, he was "looking at the log book, looking at the

bill of lading a lot closer, and also inputting information into the computer on my inspection

report."  (Tr. 130:4-6.) During their discussion, Officer Chavez told Officer Perea that Mr. Ruiz

had said that he did not remember the name of the guy from whom they had picked up the load, and that the person had parked the tractor trailer on the street in Los Angeles and then "took off." Officer Perea commented that this was very unusual and "that you don't do that."  The officers also discussed the fact that the truck cab smelled strongly of air freshener. *See* Ex. 1.

Forty-nine minutes after the stop was initiated, Officer Perea informed Defendant that he would be checking the cargo in the trailer for improper securement or other safety violations. Officer Perea asked Defendant to open the trailer.[7]  Defendant opened the trailer and put the key into his shirt pocket, and Officer Perea and Officer Chavez entered the trailer. Officer Perea immediately noticed that the load was not secured properly, that the trailer was dirty, that the load smelled rotten, and that some of the boxes were leaning over.  Using a ladder, Officer Perea looked behind the first row of boxes and noticed that boxes had shifted and fallen because they were not properly secured even though some of the front boxes were secured by banding.  The bill of lading indicated that three air bags, or dunnage bags, were supposed to be inserted between pallets to prevent shifting, but Officer Perea saw only two, and both of the bags were positioned on top of the boxes where they served no purpose.  Although the bill of lading mentioned "O Chep Pallets," which indicated that the load was not supposed to be on pallets, the boxes were loaded on pallets.

Officer Perea noticed that behind the second row of boxes, which were damaged and had fallen over, there were several boxes wrapped with shrink wrap.  Based on his training and experience, Officer Perea knew that this was not the way produce was usually shipped and that this packaging was consistent with drug packaging.  After cutting a small hole in the corner of

---

[7] The record does not indicate how Defendant obtained the key to the trailer from Officer Chavez, who had acquired the key from Mr. Ruiz.

the shrink-wrap of an item, Officer Perea smelled a marijuana odor. Officer Perea informed

Officer Chavez of his suspicions. Officer Chavez told Officer Perea that he would get

Defendant's and Mr. Ruiz's consent and "run the dog." [8]  Approximately one hour after the stop,

Officer Perea exited the trailer and continued writing his inspection report.  Officer Chavez then

closed the trailer doors, and Defendant replaced the padlock on the trailer doors.

Officer Perea told Defendant and Mr. Ruiz that he was going to inspect the cab of the

truck.  After inspecting the cab, Officer Perea completed his inspection report.  Officer Perea

then cited Defendant and placed him out of service for failing the English test and for a log book

violation.  Officer Perea cited Mr. Ruiz and placed him out of service for ten hours for a log

book violation.  Officer Perea advised Defendant and Mr. Ruiz that they must park the tractor

trailer for ten hours before Mr. Ruiz would be allowed to drive. Officer Perea then returned all of

the paperwork to Defendant and Mr. Ruiz and said that they were free to go to a nearby truck

stop to wait the requisite ten hours.[9]

Immediately after the Defendant's and Mr. Ruiz's documents were returned, Officer

Chavez told Defendant and Mr. Ruiz that he had some more questions.  Officer Chavez asked

Defendant if he was responsible for the vehicle, and Defendant answered "yes."  Officer Chavez

asked if there were any weapons, money, or drugs in the tractor or trailer, and Defendant

answered "no."  Officer Chavez noticed that when he asked Defendant about marijuana,

Defendant answered "no" while looking down and to the left.  Officer Chavez then asked

---

[8] Officer Chavez's canine, Chica, had been waiting in his patrol vehicle.

[9] Officer Perea testified that one of the officers would have escorted the tractor trailer to the truck stop.  He also testified that officers do not usually stay with the rig to make sure that the driver waits the ten hours.

Defendant if he could search the tractor and trailer.  Defendant agreed and signed a Spanish

consent form to search the tractor trailer.  Officer Chavez asked Mr. Ruiz the same questions.

Mr. Ruiz denied the existence of contraband and also signed a Spanish consent form to search

the tractor trailer.

Officer Chavez asked for and received the key to the trailer.  Officer Chavez got his

narcotic canine, Chica, from inside his vehicle and took the dog around the exterior of the rig.

Officer Chavez unlocked the trailer door, and he and canine Chica entered the trailer.  Chica

alerted to the interior of the trailer.  Officer Chavez entered the trailer and observed the shrink-

wrapped boxes.  Officer Chavez discovered a green leafy substance in one of the boxes, which

he believed to be marijuana.  Approximately ninety four minutes after the stop, Officer Chavez

arrested Defendant and Mr. Ruiz for possession of marijuana.

DISCUSSION

I.  <u>The Search Of The Trailer: Standing</u>

The Fourth Amendment to the United States Constitution protects a person's right to be

secure in his person and effects against unreasonable searches and seizures. U.S. Const. amend.

IV.  Fourth Amendment rights are personal, and a person cannot claim a violation based on the

introduction of evidence obtained through a search and seizure of a third person's property.

*United States v. Abreu*, 935 F.2d 1130, 1132 (10th Cir. 1991).  For a person to challenge the

search of a vehicle that he was driving but did not own, he must establish that he had an interest

in the vehicle that is protected by the Fourth Amendment. *United States v. Allen*, 235 F.3d 482,

489 (10th Cir. 2000).  A defendant may establish a protected interest in a vehicle by showing that

he had a subjective expectation of privacy in the vehicle and that society recognizes the

expectation as reasonable. *Id.* To meet the second factor, the Tenth Circuit requires a defendant

11

to show by a preponderance of the evidence "that he has a legitimate possessory interest in or lawful control over the vehicle." *Id.* (citations omitted); *see United States v. Carr*, 939 F.2d 1442, 1444 (10th Cir. 1991) (stating that defendant's burden to show standing is by a preponderance of evidence).  To determine whether a defendant has met his burden to show a reasonable expectation of privacy in a vehicle, the Tenth Circuit considers the following criteria: (1) whether he asserted ownership over the items seized from the vehicle; (2) whether he testified to his expectation of privacy at the suppression hearing; and (3) whether he presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle. *Id.*; *United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990) (upholding finding that defendant lacked standing because evidence showed that defendant knew that person from whom he borrowed vehicle was not legal owner).

In cases involving searches of tractor trailer units, the Tenth Circuit has determined that a person's privacy interest in the tractor must be considered separately from his privacy interest in the trailer. *See United States v. Kopp*, 45 F.3d 1450, 1452 (10th Cir.1995) (citing *Abreu*, 935 F.2d at 1133). Even if a person is rightfully in possession of the tractor, the tractor's physical connection to the trailer alone is not sufficient to establish his legitimate expectation of privacy in the trailer. *Id.* If a person fails to present evidence that he owned, rented or controlled access to the trailer or that he had some type of agency relationship with the trailer's owner through his employment or otherwise, then he lacks Fourth Amendment standing to challenge a search of the trailer. *United States v. Michael*, 2007 WL 2712964, at *8 (D.N.M. Jun 22, 2007) (Armijo, J.) (citing *Abreu*, 935 F.2d at 1133).

Defendant argues that he met his burden to establish his privacy interest in the trailer.  In his affidavit, Defendant asserts that he was lawfully in possession of the tractor-trailer because

12

Mr. Eblin Lopez contracted with him to drive a load of produce and that Mr. Eblin Lopez told him where to pick up the tractor trailer unit. (Mot. To Suppl., Doc. No. 82, Ex. A ¶¶ 2-3.) Defendant argues that he reasonably believed that Mr. Eblin Lopez had the authority to give him possession of the tractor trailer because Mr. Eblin Lopez owns a trucking company.  Defendant further argues that as an employee of a trucking company, he does not arrange his own pick-ups and drop-offs but reasonably trusts that his employer is lawfully transferring the tractor trailer unit to him.

The Court concludes that for purposes of the Fourth Amendment Defendant has failed to establish by a preponderance of the evidence Defendant's ownership or rightful possession and control of the trailer.  First, the evidence of who owned or lawfully possessed the trailer on August 2, 2008 is murky at best.  Defendant did not present the testimony of either Mr. Eblin Lopez or Mr. Melendez. However, Agent Croft testified that Mr. Melendez claimed that he had the right to possess the trailer because he had leased the trailer from Mr. Guevara. Agent Croft testified that Mr. Melendez produced a copy of the lease-purchase agreement between Mr. Moran, the former owner of the trailer, and Mr. Guevara, the purported lessee-purchaser. However, Mr. Melendez did not provide written documentation of a lease to himself from Mr. Guevara.  The only evidence of a lease between Mr. Guevara and Mr. Melendez is Mr. Melendez's unsubstantiated statement to Agent Croft, which was not subject to cross-examination.  The fact that Agent Croft released the tractor trailer unit to Mr. Eblin Lopez and Mr. Melendez after Mr. Melendez presented a copy of the Moran-Guevara lease-purchase agreement does not prove at all that Mr. Melendez owned or had the legal right to possess the trailer.

Next, there is conflicting evidence about who employed Defendant and gave possession

13

of the trailer to Defendant.  Mr. Melendez stated to Agent Croft that on July 29, 2009, he gave the tractor trailer rig to Defendant, his employee, to pick up a load of cantaloupes, which is consistent with Defendant's statement to Officer Chavez that he was employed by "Arias" [Aries] trucking, " referring to Mr. Melendez's company.  Aries was listed as the carrier on the bill of lading.  In stark contrast, Defendant states in his affidavit that Mr. Eblin Lopez contracted with him to deliver the cargo and gave him possession of the tractor trailer.

Defendant cites *United States v. Valdez-Hocker* to support his argument that he is not required to submit legal documentation showing a chain of lawful custody from the trailer's owner to himself. 333 F.3d 1206, 1208 (10th Cir. 2003).  Defendant argues that he has established standing by showing that he reasonably believed that the person who employed him to drive the tractor trailer had lawful possession of the trailer.  In *Valdez-Hocker*, the defendant was arrested after drugs were found beneath the driver's seat of a car he was driving.  The defendant testified that he borrowed the car from a friend, that he assumed that she either owned the car or was purchasing it from a relative because he had seen his friend use the car regularly and park it in her driveway, and that he knew that she was purchasing it from the registered owner. The Tenth Circuit held that the defendant had standing to contest the search of the car because he reasonably believed that he gained possession from someone with authority to grant possession.  *Id.* at 1209.  This case, however, is distinguishable from *Valdez-Hocker* because it is unclear from Defendant's evidence whether Mr. Eblin Lopez or Mr. Melendez gave possession of the trailer to Defendant and no documented or otherwise substantiated evidence directly links Mr. Eblin Lopez or Mr. Melendez with the owner of the trailer.  *See United States v. Betancur*, 24 F.3d 73, 77 (10th Cir. 1994) (holding that the borrower of a car lacks standing where car was registered to someone other than the alleged lender, and the borrower fails to present any

14

evidence of a linkage between the lender and the registered owner). Consequently, Defendant has not met his burden to show by a preponderance of the evidence that he had "some type of agency relationship with the trailer's owner, through his employment or otherwise." *Michael*, 2007 WL 2712964, at *8. Defendant does not have standing to contest the search of the trailer.

II. Defendant's Detention And Its Connection With the Evidence

Although Defendant may not directly challenge the search of the trailer, Defendant may "nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as fruit of the illegal detention." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir.) *cert. denied*, 531 U.S. 887 (2000).  To suppress the evidence, Defendant must make two showings: 1) that he was detained in violation of his Fourth Amendment rights; and 2) that there is a factual nexus between the illegal detention and the marijuana found in the trailer. *United States v. De Luca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (citing *Nava-Ramirez*, 210 F.3d at 1131). If Defendant satisfies these two elements, the burden shifts to the government to show that the evidence is not "fruit of the poisonous tree." *Id.*

A. Was Defendant Detained In Violation of His Fourth Amendment Rights Under *Terry*?

A traffic stop is a detention subject to the requirements of the Fourth Amendment.  A traffic stop is permissible if the officer's action is justified at the inception, and the officer's subsequent conduct is "reasonably related in scope to the circumstances that justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1 (1968).  During a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer verification of these documents, and issue a citation or warning. *United States v. Karam,* 496 F.3d 1157, 1161 (10th Cir. 2007).  An officer may also ask the driver questions about matters both related and

unrelated to the purpose of the stop, as long as those questions do not prolong the length of the detention. *Id.* Once the warning or citation has been issued and the driver's license and registration have been returned, the officer normally must allow the driver to proceed without further delay. *Id.*  Further detention is permissible only if "(1) the officer develops an objectively reasonable and articulable suspicion that the driver is engaged in some illegal activity, or (2) the initial detention becomes a consensual encounter." *Id.* (citations omitted).

Defendant argues that even if Officer Chavez was justified in making the initial stop for the loose brake hoses, Officer Chavez should have allowed Defendant to proceed on his way when he completed writing the warning citation for the loose hoses, about twenty to twenty five minutes after the stop was initiated.  Defendant also maintains that the officers had no authority to extend the traffic stop and conduct a roadside inspection of the tractor trailer outside of a port of entry.  *See United States v. Choundoull*, No. 09 CR 488, Memorandum Opinion and Order at pp. 17, 34 (Sept. 22, 2009) (Armijo, J.) (concluding that neither federal nor state law authorizes officers to conduct roadside cargo inspections of tractor trailers in New Mexico without reasonable suspicion or probable cause of wrongdoing).

The government contends that throughout the investigation, the officers continued to obtain information that supported a reasonable suspicion that the Defendant and Mr. Ruiz were engaged in illegal activity.  The government posits that the various suspicious circumstances taken together justified the ninety four minute detention for investigative purposes.  In addition, the government argues that Defendant was reasonably detained during a valid administrative safety inspection.

1. Was the detention reasonable?

Officer Chavez initiated the traffic stop after observing loose brake hoses, which is a

16

safety violation in New Mexico. N.M. Stat. Ann. § 65-3-8(A)(2) (2003). After discussing the

loose hoses with Defendant, Officer Chavez appropriately requested Defendant's documentation

and questioned Defendant about his travel plans and what he was hauling. *See Karam*, 496 F.3d

at 1161. The documentation Defendant gave Officer Chavez was suspicious because both

Defendant's and Mr. Ruiz's log books recorded a different destination than that shown in the bill

of lading. When asked about his travel plans, Defendant responded that he was coming from

New York and he was hauling watermelons, clearly contrary to the log book and the bill of

lading. Defendant's log book also indicated that he was off duty on the day that the cargo was

picked up, and Defendant did not know who had picked up the load. Defendant appeared

nervous, and his hands were shaking while holding his cell phone. Mr. Ruiz's log book indicated

that Columbus, Ohio was the destination, which also contradicted the bill of lading. Mr. Ruiz's

log book also showed Mr. Ruiz off duty on the date that the load was picked up. Mr. Ruiz stated

that the load was picked up in Vernon, California on the side of the road. Officer Chavez

gathered this information during the first twenty minutes of the stop.

Officer Chavez's questioning and investigation of Defendant and Mr. Ruiz prior to

Officer Perea's arrival was reasonably related in scope to the initial stop for a safety violation.

The continuing investigation by Officer Chavez led him to develop reasonable suspicion that

Defendant and Mr. Ruiz were carrying contraband of some kind or were trying to conceal other

safety violations. Detaining Defendant to investigate these suspicions did not violate

Defendant's Fourth Amendment rights.

 Approximately twenty minutes into the detention, Officer Perea arrived at the scene and

began his safety inspection by walking around the rig. Officer Perea noticed that the "doggy

door" on the back of the trailer, normally unsealed to allow ventilation, had old seals blocking

17

the vents.  Officer Perea also observed that the temperature gauge on the trailer indicated 22

degrees Fahrenheit, but the bill of lading required the temperature to be 10 to 15 degrees higher.

Officer Perea noted the inconsistent destinations recorded in Defendant's and Mr. Ruiz's log

books and the destination shown in the bill of lading.  Even though Defendant corrected himself

and stated that the route was through Columbus, Officer Perea testified that truckers record only

their destination in log books, not cities that were en route.

While questioning Defendant, Officer Perea doubted whether Defendant could speak

English well enough to qualify as a commercial truck driver.  After Officer Perea gave

Defendant a short English language test, Officer Perea determined that Defendant could not

speak, understand, or write English sufficiently to be a commercial driver.  Officer Perea also

noticed that Defendant was not able to write down where he picked up the load,[10] and when

Officer Perea asked Defendant who filled out the clearly legible log book destination, Defendant

responded that he wrote it and that he writes a "little" English.  This indicated to Officer Perea

that either someone else may have filled out the log book or Defendant purposefully wrote

illegibly when asked where the load was picked up.  Officer Perea wrote a citation placing

Defendant out of service for failing the English test.  Although Mr. Ruiz passed the English test,

he had a log book violation, and Officer Perea wrote a citation and placed Mr. Ruiz out of

service for ten hours. At this point, forty-nine minutes after the stop was initiated, Officer

Perea's investigation had been reasonably related in scope to the initial stop based on a safety

violation, and his continued investigation had produced reasonable suspicion of cargo violations

---

[10] Officer Perea testified:

    A. [Defendant] was unable to write down where he picked up the load at all.  He
    attempted to write something, but it was more scribble than anything else.  I wouldn't
    even consider it the name of anything, really. (Tr. 88:9-12.)

and perhaps other illegal activity. [11]

At Officer Perea's request, Defendant unlocked and opened the trailer so Officer Perea could confirm or reject his suspicions of safety violations or of illegal activity.[12]  When the trailer doors were opened, Officer Perea immediately observed a safety violation, insufficient securement of the produce boxes.  In addition, Officer Perea noticed a rotten odor and the dirty condition of the trailer, which are not violations, but are inappropriate when transporting fresh produce.[13]

At this point, Officer Perea had a reasonable belief that the improperly secured cargo posed a safety violation or the load contained contraband.  After looking past the first row of boxes, Officer Perea noticed some boxes had fallen over in the second row, another securement violation.  After moving three pallets to observe whether the rest of the load was secure, Officer

---

[11] Officer Perea, like Officer Chavez, is allowed to issue citations for safety and regulatory violations. N.M. Stat. Ann. § 65-1-7 (2003).

[12] The Court recognizes that under the vehicle exception to the warrant requirement, an officer must have probable cause, consent or some other legal substitute for a warrant to lawfully search the interior of a vehicle during a *Terry* stop.  *United States v. Forbes*, 528 F.3d 1273, 1277-78 (10th Cir. 2008).  The Court finds that the officers legally opened the trailer because they had the authority under the administrative inspection exception or they had Defendant's and Mr. Ruiz's implied consent. Significantly, Defendant did not contest the voluntary nature of his implied consent when he opened the trailer doors at Officer Perea's request. Officer Perea's entry into the trailer was, therefore, lawful and not in violation of the Fourth Amendment. *See infra* discussions on administrative search and consent.

[13] Officer Perea testified:
A.  Exhibit 17 is a picture of a floor area of the trailer. It's very dirty, which is not acceptable and is an uncommon practice when you're hauling any type of food items. This one was hauling cantaloupe. I was very surprised to see this extremely dirty, dirty trailer.
Q.  When you opened the doors, did you smell anything?
A. . . . You're hauling fresh produce.  You would think it's going to smell fresh.  It didn't.  It smelled rotten.  Something was rotten in the trailer. (Tr. 98:22-99:8.)

Perea then saw that several boxes were shrink wrapped, which his training had taught him was consistent with drug packaging.  The combination of suspicious circumstances leading up to and including the discovery of the shrink wrapped packages gave Officer Perea reason to believe the shrink wrapped boxes contained contraband.  After cutting the shrink wrap, Officer Perea smelled marijuana.  Any further detention of Defendant after Officer Perea discovered the marijuana was supported by probable cause to believe Defendant had committed a crime and therefore was lawful under the Fourth Amendment.

In sum, throughout the investigation, each officer's conduct was reasonably related to the circumstances justifying the stop for a safety violation.  When numerous suspicious circumstances progressively came to light, beginning with the inconsistent information in the documents and continuing through the discovery of the marijuana, both officers were justified in detaining Defendant to investigate these circumstances until their suspicions were confirmed or dispelled. *See Kopp*, 45 F.3d at 1453-54 (finding reasonable suspicion justified continued detention of defendant based on implausible purpose for cross country trip, defendant's uncertainty of destination, inconsistent answers about travel plans between defendant and passenger, and defendant's unusual nervousness).  Through the course of their ninety four minute investigation, the officers developed objectively reasonable and articulable suspicion to believe that Defendant was involved in illegal activity.  Consequently, Defendant's detention was reasonable and did not violate the Fourth Amendment.

## 2. Assuming the detention was unlawful, was there a factual nexus between the illegal detention and the marijuana?

Even if Defendant's detention were illegal, Defendant must also show that the discovery of the marijuana resulted from Defendant's unlawful detention. *See Nava-Ramirez*, 210 F.3d at

20

1131 (noting that defendant failed to show that the evidence sought to be suppressed would not have come to light but for the government's unconstitutional detention). Under the *Nava-Ramirez* standard, the government is not required to show that the marijuana discovered during the illegal detention was not the "fruit of the poisonous tree." 210 F.3d at 1131. In other words, the government has no obligation to prove a negative.

Defendant has presented no evidence that, but for his detention, the marijuana would not have been found.  Defendant failed to demonstrate that at some point after Officer Chavez completed writing the warning citation for the loose hoses, Defendant would have been allowed to leave with the tractor trailer had he requested permission to leave or had he otherwise attempted to depart the scene.  *See id.* (noting that defendant presented no evidence that had he requested, he would have been allowed to leave in the car that was searched); *see also DeLuca*, 269 F.3d at 1133 (stating that without any evidence to the contrary, "we must assume that regardless of Mr. DeLuca's presence, the car and its owner would have continued to be detained and the officer would still have found the methamphetamine.").  Thus, Defendant has failed to meet his burden of proving a factual nexus between his detention and the discovery of the marijuana in the trailer.

In sum, although Defendant lacks standing to challenge the search of the trailer, Defendant has standing to attack the basis for his detention.  Under these circumstances, the ninety-four minute detention of Defendant was reasonable because it was supported throughout by sufficient, increasing, articulable suspicion of illegal activity.  However, even if  Defendant's detention was unlawful, Defendant has failed to show that there is a factual nexus between the discovery of the marijuana and his unlawful detention.

21

B.  Defendant's Detention in the Context of an Administrative Inspection

Defendant argues that once Officer Chavez finished writing the warning citation for the loose hoses, the detention should have ended.  Defendant maintains that the unlawful detention began when Officer Perea arrived and detained him to perform an unauthorized administrative inspection.  Again, Defendant does not have standing to challenge the administrative search of the trailer, but Defendant does have standing to challenge his detention while the administrative search was being conducted; therefore, the Court must analyze whether Officer Perea performed a valid administrative inspection under the circumstances presented here.  The government argues that the officers' reasonable suspicions were sufficient to continue to detain Defendant through the entire search of the trailer, which was carried out under Officer Perea's authority to conduct administrative safety inspections under New Mexico and federal law. [14]

A person who operates a pervasively regulated business is subject to warrantless administrative searches or inspections of his business if the regulatory scheme under which the searches or inspections are performed satisfies the strictures of the Fourth Amendment. *New York v. Burger*, 482 U.S. 691, 702 (1987).[15]  In *United States v. Vasquez-Castillo*, the Tenth

_____

[14] The Court notes that under the vehicle exception to the warrant requirement, the officers needed probable cause to enter the trailer. *United States v. Forbes*, 528 F.3d 1273, 1277-78 (10th Cir. 2008).  However, the government does not rely on a probable cause argument but instead relies on the administrative search exception to justify Officer Perea's entry into the trailer and to justify Defendant's continued detention during the inspection.

[15]  An administrative search is a separate basis upon which a commercial vehicle may be detained and searched.  Under the *Burger* doctrine, administrative search inspections must satisfy three criteria in order to pass Fourth Amendment muster. 482 U.S. at 702.  First, there must be a substantial government interest in the regulatory scheme in accordance with which the inspection is made. Second, the warrantless inspection must be necessary to further the regulatory scheme. Finally, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. *Burger*, 482 U.S. at 702-03.

Circuit applied the *Burger* criteria and upheld the constitutionality of New Mexico's regulatory scheme for warrantless inspections of commercial trucks at designated ports of entry. 258 F.3d 1207, 1210 (10th Cir. 2001).  Here, the government argues that this roadside inspection also should be upheld because New Mexico MTD officers are authorized to stop and detain truck drivers in order to conduct roadside safety inspections under state and federal regulations adopted as part of the New Mexico regulatory scheme.  Defendant argues that a New Mexico MTD officer has no authority under New Mexico law to detain a truck driver to perform a warrantless roadside inspection of a tractor trailer; thus, Defendant's detention violated his Fourth Amendment rights.

These arguments raise two basic questions. First, whether an officer of the New Mexico MTD has the authority to detain a truck driver to perform a roadside safety inspection away from a designated port of entry.  Second, if a New Mexico MTD officer has such authority, whether the roadside detention and inspection scheme is constitutional under *Burger*.

　　　1. <u>Are MTD Officers Authorized to Detain Truck Drivers to Inspect Motor Carriers Roadside?</u>

In New Mexico commercial trucking is regulated under the New Mexico Motor Transportation Act (the "Motor Transportation Act"). *See* N.M. Stat. Ann. §§ 65-1-1 et seq. (2003). The New Mexico Department of Public Safety enforces the New Mexico Motor Transportation Act. N.M. Stat. Ann. § 65-1-9 (2003). Section 65-1-11 of the Motor Transportation Act provides that the New Mexico Department of Public Safety "shall designate the main highways upon which motor carriers shall enter and leave the state and shall designate stations or establish places, either temporary or permanent, where inspection, registration and permit services shall be maintained." N.M. Stat. Ann. § 65-1-11.  Article 3 of the New Mexico

Motor Transportation Act, entitled the "Motor Carrier Safety Act," sets out the safety standards

for commercial trucks.  N.M. Stat. Ann. §§ 65-3-1 et seq. (2003).  In Article 3, the Department

of Public Safety is directed to adopt rules and regulations applicable to motor carrier safety that

are not inconsistent with or more stringent than applicable federal safety standards. N.M. Stat.

Ann. § 65-3-4 (A).  Section 65-3-8 of Article 3 provides in relevant part:

> A.  No person shall drive a motor vehicle and no motor carrier shall be required or permit
> a person to drive a motor vehicle, unless the driver has satisfied himself that:
>> (1) all safety-related parts and accessories are in good working order;
>> (2) the cargo and equipment are properly distributed and secured; . . .

N.M. Stat. Ann. § 65-3-4 (A)(1), (2) (2003).  Section 65-3-9 states,

> The director shall adopt regulations not inconsistent with or more stringent than
> applicable federal safety standards concerning the following parts and accessories
> necessary for the safe operation of a commercial motor carrier:
> . . .
>> B. brake systems and performance;
>> . . .
>> L. cargo securement; . . .

N.M. Stat. Ann. § 65-3-9 (2003).  Article 3 also requires the Department of Public Safety to

adopt regulations concerning the systematic inspection, repair and maintenance of all

commercial motor carrier vehicles:

> A. The regulations shall provide for the following:
>> . . .
>> (2) inspection of motor vehicles in operation by certified inspectors of the
>> division at ports of entry, **at suitable locations along the highway** and at a
>> carrier's place of business; . . .

N.M. Stat. Ann. § 65-3-12(A)(2) (2003) (emphasis added).

In carrying out its mandate to adopt regulations and standards concerning parts and

accessories necessary for the safe operation of a commercial motor carrier, the Department of

Public Safety has adopted Parts 382, 385, 387, 390, Appendix F (Commercial Zones), 391, 392,

393, 395, 396 and Appendix G of Subchapter B of Chapter III of Title 49 of the Code of Federal

Regulations. *See* N.M. Admin. Code §§ 18.2.3.10 and 18.2.3.15 (2009).  Specifically by

adopting federal regulation 49 C.F.R. § 396.9 (a), the Secretary of the Department of Public

Safety has authorized MTD officers "to enter upon and perform inspections of motor carriers'

vehicles **in operation**." N.M. Admin. Code § 18.2.3.15 (2009) (emphasis added).  The

Department of Public Safety adopted Part 396 of Title 49 of the Code of Federal Regulations (49

C.F.R. – Inspection, Repair, and Maintenance) and Appendix G (Minimum Periodic Inspection

Standards) of Subchapter B of Chapter III of Title 49 of the Code of Federal Regulations with

the following amendment:

> A. Part 396.9(a) Personnel authorized to perform inspections is amended to add: If the
> persons have successfully completed approved training, have met minimum performance
> standards and have been certified and approved by the director of the division, all
> personnel of the motor transportation division, police officers and any other state
> inspectors are authorized to enter upon and perform inspections of motor carriers'
> vehicles **in operation**.

N.M. Admin. Code § 18.2.3.15 (2009) (emphasis added).  The Department of Public Safety also

adopted Part 396.17 of C.F.R. Title 49, which provides that "[e]very commercial motor vehicle

must be inspected as required by this section. These inspections must include, at a minimum, the

parts and accessories set forth in appendix G of this subchapter." 49 C.F.R. § 396.17(a).

Appendix G lists in relevant part the following parts and accessories:

> a. the brake system;
> b. safe loading; . . .

49 C.F.R. Ch. III, Subch. B, App.  G.

New Mexico Statute Chapter 65, Article 5, entitled "Procedures for Vehicles Entering or

Leaving State," requires that all commercial motor carrier vehicles "must enter, leave or travel

through the state on designated highways and shall stop at every port of entry . . ." N.M. Stat.

Ann. § 65-5-1 (2003).  Officers at ports of entry are authorized to "inspect the contents of the vehicle to determine whether all taxes on gasoline and motor fuel and excise taxes on alcoholic liquors and all taxes on any other property have been fully paid." N.M. Stat. Ann. § 65-5-1(E) (2003).  And officers at ports of entry are authorized to "inspect the vehicle and its contents to determine whether all laws and all rules and regulations of the departments of this state with respect to public safety, health, welfare and comfort have been fully complied with."  N.M. Stat. Ann. § 65-5-1(F) (2003).

Defendant argues under N.M. Stat. Ann. § 65-1-11 and Article 5 of the New Mexico Motor Transportation Act that Officer Chavez impermissibly expanded the roadside stop when he called Officer Perea to do an inspection of the tractor trailer outside of a port of entry. Defendant contends that the only procedure for detention and inspection of tractor trailers in New Mexico is found in Chapter 65, Article 5 (N.M. Stat. Ann. § 65-5-1 et seq.), which provides for inspections at ports of entry.  Defendant cites *State v. Clark*, 816 P.2d 1122 (N.M. 1991) in support of his argument.

In *Clark*, an MTD officer stopped a rental truck without observing a traffic or equipment violation, and proceeded to inspect the truck's cargo even though the defendant did not have a key to the locked cargo door.  The officer cut the lock with bolt cutters.  *Id.* at 1123.  The officer justified his stop and inspection because the officer considered himself a "temporary port of entry."  *Id.* at 1123 (noting that "the officer stopped vehicles randomly and at his own discretion."). The New Mexico Supreme Court stated,

. . . we decline to adopt the officer's contention that he "considers himself" a temporary port of entry. Instead, we are guided by *State v. Creech*, 111 N.M. 490, 806 P.2d 1080 (Ct.App.1991), which holds that in the absence of reasonable suspicion, stops must be carried out pursuant to a plan which embodies explicit, neutral limitations on the conduct of individual officers. In this case, the officer testified that he makes stops on any road he decides; that he, as opposed to his supervisor, makes the decision to search or not; that there are no set guidelines in the statutes that tell him what trucks to stop or search, and that he chooses his own schedule of where he patrols. Based on this information, we conclude that his actions, which were not carried out at a port of entry, were not authorized by any department practice or regulation.

*Id.* at 1123-24. The *Clark* court concluded "in the absence of any reasonable suspicion, we hold that the officer's actions were not justified." *Id.* at 1124.

This case, however, does not involve an officer who pulled over a defendant to inspect his tractor trailer because the officer considered himself a temporary port of entry; instead Officer Chavez stopped Defendant for a violation of state and federal regulations, loose brake hoses. *See also United States v. Grant*, No. 05 CR 2511, 2006 WL 1305037, *7 (D.N.M. Apr. 10, 2006) (Browning, J.) (noting that a New Mexico MTD roving patrol officer may stop a commercial vehicle if the officer has reasonable suspicion to believe that the driver had violated or was violating a law). It is clear that under New Mexico and federal law, Officer Chavez was justified in stopping Defendant roadside for a visible safety violation. *Id.*; *see also United States v. Landell*, 2007 W.L. 2712962, at *11 (D.N.M. 2007) (Armijo, J.) (noting that New Mexico MTD officers have authority to enforce safety laws during validly initiated traffic stops).

Officer Perea's roadside administrative inspection then becomes the focus of the analysis. The government argues that the New Mexico Motor Carrier Safety Act and the federal regulations adopted through the New Mexico Administrative Code permitted Officer Perea to detain Defendant and to inspect the tractor trailer outside of a port of entry while the tractor trailer was "in operation." *See* N.M. Admin. Code § 18.2.3.15 (2009). In addition, the

government argues that this regulatory scheme under which Officer Perea did his roadside inspection is constitutional under *Burger*.

The Tenth Circuit has not directly addressed whether administrative roadside inspections of tractor trailers are permissible in New Mexico.[16] However, two judges in the District of New Mexico have held that, without reasonable suspicion or probable cause, roadside inspections involving entry into trailers to verify the contents of cargo are not authorized by either New Mexico or federal law and are unconstitutional under *Burger*. *See United States v. Choundoull*, No. 09 CR 488, Memorandum Opinion and Order (Doc. No. 61) (Sept. 22, 2009) (Armijo, J.) (stating that New Mexico patrolmen are not authorized to conduct searches of tractors or trailers on the roadside away from established ports of entry)*; United States v. Heath*, No. 08 CR 451, Memorandum Opinion and Order (Doc. No. 83) (Mar. 2, 2009) (Conway, J.) (same).

In *United States v. Choundoull*, a MTD officer stopped Mr. Choundoull's tractor trailer rig on Interstate 40 near the Laguna Pueblo in New Mexico for failing to have properly illuminated identification lamps on the trailer. *Id.* at 10. The officer issued Mr. Choundoull citations for the inoperative lights and a log book violation. After completing the citations, Officer Lucero performed a Level II safety inspection, which included an inspection of the cargo "to check [] the loading and bracing of the load [and also to] verify[] the load with the bills."[17]

---

[16] The Tenth Circuit, however, has upheld a roadside inspection authorized under Kansas law. *See United States v. Herrera*, 444 F.3d 1238, 1244 (10th Cir. 2006); *United States v. Burch*, 153 F.3d 1140, 1142 (10th Cir. 1998).

[17] Inspections of commercial vehicles are done under the "North American Standard Inspection Procedures." Three levels of inspection are relevant here. Level I is the most comprehensive and includes an inspection of the undercarriage of the vehicle. Level II is less intrusive but involves all of the components of a Level I inspection except the undercarriage. Level III is the least intrusive and involves an inspection of the driver's documents only. (Tr. 76:15 – 77:21 (Testimony of Major Ron Cordova)).

*Id.* at 15.  Officer Lucero determined that the cargo of trees and unmarked boxes, "was secure and safely loaded and did not pose a safety issue for travel on New Mexico highways." *Id.* at 16. Because the bill of lading did not indicate that the cargo included unmarked boxes, Officer Lucero cut into one of the unmarked boxes and discovered marijuana.  The Honorable United States District Court Judge Christina M. Armijo found that when he cut into the box and subsequently into the bundle of marijuana, Officer Lucero "did not have Mr. Choundoull's consent, and he did not have reasonable suspicion or probable cause to believe that Mr. Choundoull was engaged in drug trafficking." *Id.* at 17.  Judge Armijo concluded that a New Mexico MTD officer has no authority outside of a port of entry to verify the contents of cargo without reasonable suspicion or probable cause to believe criminal activity was afoot. *Id.* at 29 (citing North American Standard Inspection Procedures, the Federal Motor Carrier Safety Regulations 49 C.F.R. §§ 300-399, the New Mexico Administrative Code tit. 18, Ch. 2, Part 3 and the New Mexico Motor Transportation Act, N.M. Stat. Ann. §§ 65-5-1 et seq. (2003)).

In *Heath*, a MTD officer pulled over a tractor trailer rig because he noticed some loose boards resting on the spare tire rack under the trailer, which was a safety violation. *Heath*, No. 08 CR 451, Memorandum Opinion and Order (Doc. No. 83) at p. 2.  The officer testified that at the time he pulled the tractor trailer over, he intended to perform a cargo inspection. *Id.* The officer noted a log book violation, but all of the other documents were in order.  *Id.* After issuing citations for the loose boards and the log book violation, and after learning from a computer check that both individuals in the truck had law enforcement entries tied to narcotics transportation, without consent of either occupant the officer opened the trailer to inspect the cargo.  After noticing a gap between the pallets of produce, the officer climbed further into the trailer and noticed some inconsistent brown boxes. The officer cut into one of the boxes and

smelled raw marijuana.  The traffic stop lasted more than an hour.  The Honorable Senior United

States District Judge John E. Conway noted that the government never argued that the officer

developed probable cause to search the contents of the trailer. *Id.* at p. 4. Judge Conway

concluded that the New Mexico statutory and regulatory scheme allows for inspections of cargo

only at ports of entry and that an interoffice memorandum relied upon by the officer in *Heath* as

his authority to perform inspections did not carry the force of law.  On the issue of whether New

Mexico law provides sufficient notice to commercial businesses under *Burger*, Judge Conway

wrote:

> . . . the government has identified no language in the New Mexico state statutory scheme
> or regulations that provides commercial truck drivers with the necessary notice that they
> are subject to roadside inspections, including cargo inspections, by roving patrols during
> traffic stops. Here [the officer] decided to conduct a roadside inspection of the tractor-
> trailer and its cargo prior to ever making contact with the vehicle or the Defendants. [The
> officer] erroneously relied upon an inter-officer memorandum for what he evidently
> believed to be his unbridled authority to conduct roving cargo inspections as long as he
> had a valid reason for the traffic stop and existing conditions made it safe for him and the
> public.

*Id.* at p. 7.

This case is distinguishable from *Choundoull* and *Heath*.  The officers in both

*Choundoull* and *Heath* were MTD officers who decided to perform safety and cargo inspections

prior their stops.  In this case, Officer Chavez, a New Mexico state patrolman, did not testify that

he intended to perform, or call someone to perform, a cargo inspection at the time he stopped

Defendant's tractor trailer for an obvious safety violation.  Officer Chavez called for back up

from the MTD after getting suspiciously inconsistent information from Defendant's and co-

driver Ruiz's documents and from their answers to questions about their travel and cargo.

Moreover, *Choundoull* is distinguishable from this case because Mr. Choundoull's papers

were basically in order, and he was cooperative and consistent in his answers to the officer's

30

questions. *Choudoull*, 09 CR 488, Mem. Op. (Doc. No. 61) at p. 13.  Here, there was a

suspicious contradiction between the destination in both log books and the bill of lading

destination. And, Defendant's explanation that he recorded Columbus, Ohio in his log book

because it was en route to New York was implausible since truckers typically record only their

destination in their log books.

In *Heath*, the MTD officer found a minor log book violation and discovered that the

driver had a criminal history, but the issue of detaining the driver to resolve reasonable suspicion

was neither raised by the government nor addressed by Judge Conway.  Instead, in *Heath* the

government relied solely on the officer's presumed authority to perform a roadside safety

inspection, including an administrative  cargo inspection, without regard to suspicious

circumstances. *Heath*, No. 08 CR 451, Mem. Op. (Doc. No. 83) at p. 2.

In both *Choudoull* and *Heath*, the courts stressed that no New Mexico or federal

regulation specifically allows officers to verify the contents of a trucker's cargo.[18] However,

Officers may inspect commercial vehicles for securement violations under New Mexico law and

the incorporated federal regulations. *See* N.M. Stat. Ann. § 65-3-4 (A)(1), (2) (2003); N.M.

Admin. Code §§ 18.2.3.10 and 18.2.3.15 (2009); and 49 C.F.R. § 396.17(a) (Appendix G).

Neither officer in *Choudoull* and *Heath* observed securement violations once the trailer doors

were opened. And, in both *Choudoull* and *Heath*, nothing about the securement or appearance of

the cargo raised suspicions that illegal contraband was present.  In contrast, the officers in this

---

[18] In *Choundoull* the court noted that the officer could not identify any part of the New Mexico
Transportation Act that authorized MTD officers to verify cargo contents.  The court further
found that verification of cargo is not specifically authorized under the North American Standard
procedure or federal inspection regulations.  *See Choundoull*, 09 CR 488, Mem. Op. (Doc. No.
61) at pp. 17-18.

case observed significant securement violations, which ultimately led to the discovery of the nonconforming boxes and the marijuana.  Officer Perea observed immediately upon opening the cargo doors that the load was unsafely secured, that the inside of the trailer was in an unacceptable dirty condition, and that the produce smelled rotten. This condition, when added to all of the prior suspicious observations, led Officer Perea to suspect that the cargo of produce was not legitimate, but was instead a cover for illegal activity.

The special and extensive suspicious circumstances observed by Officers Chavez and Perea were much greater and quite different from those seen by the officers in *Choudoull* and *Heath*.  In this case, Officer Chavez noted these suspicious circumstances during the first approximately twenty minutes after he stopped the tractor-trailer and before Officer Perea arrived:

1. Defendant's logbook showed that he was off duty from July 27 through August 1, 2008, but the bill of lading produced by the Defendant showed that the cargo of cantaloupes had been picked up on July 30, 2008.

2. Defendant told Officer Chavez that another driver, whose name Defendant did not know, had picked up the load.

3. Defendant stated that he did not know where the load had been picked up.

4. On the bill of lading, the signature of the person who picked up the load is illegible, but is not the same as Defendant's signature.

5. The bill of lading indicated that the load was to be delivered to Schenectady, New York, but Defendant's logbook showed that Columbus, Ohio was his destination.

6. When Officer Chavez asked Defendant about his travel plans and cargo, Defendant said that he was coming from New York and was hauling

watermelons, but when Officer Chavez pointed out the different destination in Defendant's logbook Defendant responded, "Yeah, New York, but the route is Columbus."

7.     While talking to Officer Chavez, Defendant appeared to be nervous and his hands were shaking when he was holding his cell phone.

8.     Next, Officer Chavez asked the co-driver, Mr. Ruiz, for his driver's license and logbook, which showed that Mr. Ruiz was off duty from July 27 through August 1, 2008, even though the cargo of cantaloupes had been picked up on July 30, 2008.

9.     Mr. Ruiz told Officer Chavez that he and the Defendant picked up the tractor-trailer parked on a street in Verno, California, but Mr. Ruiz did not know who had originally picked up the load and left it on the street.

10.     Mr. Ruiz said that they were taking the load to Columbus, Ohio which was consistent with Mr. Ruiz's logbook but conflicted with the bill of lading which showed a destination of Schenectady, New York.

11.     While Officer Chavez was writing a warning citation for the loose hoses between the tractor and the trailer, it appeared to Officer Chavez that Defendant was sick and about to vomit; Officer Chavez asked Defendant if he was ill and Defendant responded, "Yeah."

After Officer Perea arrived, approximately twenty minutes after the stop, in successive order Officer Perea developed the following additional suspicious circumstances:

12.     Officer Perea noticed that the "doggy door" on the rear of the trailer had old seals covering the vents which was unusual because produce loads, in particular, need

the vents to be open and unsealed; from his experience, Officer Perea knew that drivers of refrigerated loads, like the one Defendant was driving, usually keep the vents open when produce is being hauled.

13. Officer Perea saw the temperature gauge showed the internal temperature of the trailer to be 22 degrees Fahrenheit, but the bill of lading specified that the temperature should be between 33 and 36 degrees Fahrenheit.

14. Officer Perea inspected Mr. Ruiz's logbook and found suspicious an entry that showed Mr. Ruiz was off duty on the day the cargo was loaded.

15. Mr. Ruiz told Officer Perea that they were going to New York, which was contrary to what Mr. Ruiz had just said to Officer Chavez about going to Columbus, Ohio.

16. When Officer Perea started talking to Defendant, Defendant indicated he spoke "little English" which Officer Perea found to be suspicious because a commercial truck driver was supposed to be able to understand and speak sufficient English to drive a commercial vehicle.

17. In response to Officer Perea's questions, Defendant said that he was coming from "New York" but when asked where he was going said "I do not understand."

18. Defendant told Officer Perea that "watermelons, melones" were in the trailer although the bill of lading showed that the content of the trailer was cantaloupes.

19. When Officer Perea asked Defendant to write down the place where he had picked up the load, Defendant was unable to do that although he told Officer Perea that he personally filled out his logbook in which the destination "Columbus, Ohio" suspiciously was very clearly printed.  This led Officer Perea

34

to believe that Defendant either was faking his inability to write the location of where he had picked up the load or someone else instead of Defendant had filled out Defendant's logbook printing very clearly the destination of "Columbus, Ohio."

After the above-described suspicious circumstances were observed during the first forty-nine minutes after the stop, the officers continued to discover more suspicious circumstances:

20.     When Officer Chavez reported to Officer Perea that Mr. Ruiz had said he did not remember the name of the person from whom they had picked up the load and the person had simply parked the tractor-trailer on the street in Los Angeles and then took off, Officer Perea commented that this was very unusual.

21.     The officers noted that the cab of the truck smelled strongly of air freshener which to them was suspicious.

22.     As soon as the trailer door was opened, Officer Perea saw that the load was not secured properly, that the trailer was dirty, that the load smelled rotten, and that some of the boxes were leaning over.

23.     On looking beyond the first row of boxes, Officer Perea saw that boxes had shifted and fallen because they were not properly secured.

24.     Officer Perea also noticed that some of the front row of boxes had been secured by banding and it was suspicious that the boxes in front, which would be the first to be seen, had been secured whereas those behind the front row had not.

25.     Although the bill of lading required the insertion of three dunnage bags between pallets to prevent shifting, Officer Perea noted that there were only two bags and both were positioned on top of the boxes where they served no useful purpose.

35

26.     The bill of lading mentioned "O Chep Pallets" meaning the load was not supposed to be on pallets, but the boxes in fact were loaded on pallets.

27.     Officer Perea observed that the boxes in the second row were damaged and had fallen over which suggested that they were not the primary cargo.

28.     Behind the row of boxes that had fallen over, Officer Perea saw boxes wrapped with shrink wrap which from his training indicated that this was not the way produce was usually shipped but was consistent with drug packaging.

29.     On cutting a small hole in the corner of a shrink-wrapped item, Officer Perea smelled the odor of marijuana.

Officers Chavez and Perea discovered these twenty-nine suspicious circumstances during a continuous, uninterrupted investigation they performed in an effort to allay their concerns. However, their efforts led to their finding of one after another of more suspicious circumstances culminating in the discovery of the marijuana.

Based on all of their observations before the trailer door was opened, Officer Chavez and Officer Perea reasonably suspected that the trailer would contain further regulatory violations or evidence of illegal activity.  When Defendant voluntarily unlocked the trailer door, Officer Perea observed a dirty trailer, an improperly secured load that was leaning over, both air bags improperly placed, several boxes falling over, and rotten smelling produce. Apart from any reasonable suspicion of illegal activity like the transportation of contraband, the obvious safety violations and unacceptable conditions in the trailer alone justified Officer Perea's entry into the trailer to inspect the securement of the

36

cargo as authorized under New Mexico and federal safety laws.[19]

The Court concludes that Officer Chavez had reasonable suspicion to stop and detain Defendant and his rig for a safety violation.  New Mexico and federal regulatory scheme allowed Officer Perea to further detain Defendant to perform a safety inspection.  During the detention, suspicious circumstances caused the officers to suspect that Defendant's cargo might have been loaded in violation of New Mexico and federal safety laws. Hence, Officer Perea had the authority to detain Defendant further to conduct a warrantless cargo securement inspection as part of an administrative safety inspection.[20]

## 2.  Does the roadside inspection scheme meet the *Burger* criteria?

The government argues that New Mexico's regulatory scheme allows roadside detentions and safety inspections and should be upheld under *Burger*.  Noting that the Tenth Circuit has yet to rule on this issue, the government points to the First Circuit's opinion in *United States v. Maldonado*, 356 F.3d 130, 136 (1st Cir. 2004) and asks the court to apply its analysis to New Mexico's regulatory scheme.  In *Maldonado*, the First Circuit concluded that the Maine regulatory scheme, which authorized certain Maine state police officers to enforce federal regulations, was constitutional under *Burger*.  *See id.* at 132-134 (noting that the Maine State Police were authorized to adopt rules incorporating the federal administrative regulatory

---

[19] After viewing the unsafe securement of the cargo, it was reasonable for the officers to investigate the extent of the safety violation. *See* 49 C.F.R. §§ 393.102 et seq. (outlining requirements for proper blocking and bracing of cargo to protect against shifting front to back and sideways in transit).

[20] The Court recognizes that its finding that Officer Perea performed a valid roadside inspection is primarily supported by the specific suspicious circumstances apparent to Officers Chavez and Perea.  The special and detailed facts in this case do not provide an appropriate context in which to opine whether an MTD officer can perform a safety inspection roadside without reasonable suspicions of illegal or unsafe activity.

framework). The First Circuit's discussion of Maine's regulatory scheme under the *Burger* criteria is instructive:

> As to the first criterion, it cannot be gainsaid that the government has a significant interest in regulating the interstate trucking industry (e.g., to ensure traveler safety, . . . ) . . . As to the second criterion, we think it self-evident that warrantless inspections of commercial trucks are necessary to further the regulatory scheme. . . .The regulatory scheme applicable to the interstate commercial trucking industry also satisfies the final *Burger* criterion. The carefully delineated scope of the federal regulations suitably cabins the discretion of the enforcing officer. Moreover, the regulations themselves give ample notice to interstate truckers that inspections will be made on a regular basis. To cinch matters, commercial drivers are required by law to be familiar with the applicable regulations, *see* 49 C.F.R. § 390.3(e)(2) . . . Since all three of the *Burger* criteria are satisfied, it follows inexorably that an administrative search of a commercial truck is constitutionally permissible. . . .

*Maldonado*, 356 F.3d at 135-36.  In its examination of the third *Burger* criterion, the First Circuit focused on the certainty and regularity of the application of the incorporated federal regulations and determined that the regulatory scheme provided a constitutionally adequate substitute for a warrant. *Id.*

In *United States v. Ponce-Aldona*, 579 F.3d 1218, 1225 (11th Cir. 2009), the Eleventh Circuit examined the regulatory scheme adopted by the state of Georgia.  Georgia, like New Mexico, incorporated federal regulations including 49 C.F.R. § 396.9(a) and authorized its certified law enforcement officers "to stop, enter upon, and perform inspections of motor carrier's vehicles in operation." *Id.*  In upholding the scheme under *Burger*, the court concluded that Georgia provided "ample notice" to owners of commercial vehicles and drivers that a commercial vehicle operating on Georgia's public highways would be subject to being stopped and inspected. *Id.* at 1225-1227.  Similarly, New Mexico's regulatory scheme, which incorporates several portions Title 49 of the Code of Federal Regulations, like the Maine and Georgia schemes, allows MTD officers certified to enforce federal regulations to inspect

vehicles "in operation." *See* N.M. Admin. Code § 18.2.3.15 (2009) (incorporating 49 C.F.R. § 396.9(a)).  New Mexico's regulatory scheme, including the incorporated federal regulations, therefore, should be upheld under *Burger* because it provides an adequate substitute for a warrant.

Defendant's detention during the first twenty minutes of the stop did not violate the requirements of *Terry*.  Defendant's further detention under New Mexico's administrative inspection scheme, which allows MTD officers to check securement of cargo roadside after a commercial vehicle has been stopped for a safety or traffic violation, did not violate the Fourth Amendment.  Defendant was reasonably detained while Officer Perea performed the roadside safety inspection, which included entry into the trailer to determine the safety of the cargo. Once Officer Perea observed the blatant cargo securement violations, he reasonably detained Defendant to further examine securement of the rest of the cargo, which led to the discovery of the shrink wrapped boxes and the marijuana.

III.  Consent

Although Defendant and the government focus on the validity of Defendant's written consent, implied consent is also apparent on the facts in this case. Within a few minutes after the stop, Officer Chavez requested the key to the trailer from Mr. Ruiz, who was sitting in the passenger's seat of the tractor.  Mr. Ruiz immediately cooperated and gave Officer Chavez the key. At this point, Mr. Ruiz, who had control of the trailer's key, impliedly consented to the opening of the trailer. *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999) (upholding finding that defendant consented to search of locked bag when defendant gave key to officer when asked).  Moreover, the evidence shows that when Officer Perea later asked Defendant to

unlock the trailer doors, Defendant did so without objection.[21] *See id*. at 766 (finding that defendant's failure to object to a search of his locked bag after officer asked "can you open that" was significant to court's finding that consent to search was voluntary). In addition, there is no evidence (and Defendant did not argue) that the implied consent to open the trailer from Mr. Ruiz and from Defendant was somehow coerced or involuntary.

Further, written consent was obtained about one hour into the stop.  After observing the shrink wrapped pallets and smelling marijuana, Officer Perea informed Officer Chavez of his findings and both officers exited, and Defendant locked the trailer.  Officer Perea then returned all of the paperwork to Defendant and Mr. Ruiz and advised them that they were free to go to a nearby truck stop to wait the requisite ten hours. Immediately Officer Chavez told Defendant that he had more questions, and after a few questions about whether the trailer contained contraband, Officer Chavez asked for and received written consent in Spanish from both Defendant and Mr. Ruiz to search the trailer.

Defendant argues that the written consent was invalid because it was preceded by an unlawful detention. This argument fails because as discussed, *supra*, Defendant's detention was lawful.  Defendant further argues that the written consent was involuntary because under the circumstances a reasonable person would not feel free to leave even though Officer Perea returned their documents and told Defendant and Mr. Ruiz that they were free to go to the nearby truck stop.  Defendant, however, has no standing to challenge his consent to search the trailer, and from the smell of marijuana the officers had probable cause to believe that the trailer contained contraband before receiving written consent. Thus, the argument that the written

---

[21] With no direct evidence being presented, the Court assumes that Officer Chavez gave the key to Defendant sometime after Officer Perea arrived.

consent was invalid fails.

IV. Conclusion

Defendant does not have standing to directly challenge the trailer search.  Defendant was reasonably detained during this traffic stop, and his Fourth Amendment rights were not violated. Even if Defendant was detained in violation of his Fourth Amendment rights, the discovery of the marijuana was not linked to that detention, and is admissible evidence. Officer Chavez had reasonable suspicion under New Mexico and federal trucking laws to detain Defendant to investigate a safety issue, namely, the loose brake hoses.  Officer Perea also properly detained Defendant under those laws to perform a warrantless safety inspection.  Once Officer Perea opened the trailer and saw the improper securement of the cargo, he reasonably continued to investigate the securement, which led to the discovery of the shrink wrapped boxes.  Based on his training and experience that shrink wrap is not used for produce and that shrink wrap is used to transport contraband, Officer Perea then had reason to search those boxes for contraband. Thus, the officers lawfully detained Defendant in order to perform that search.  Alternatively, Mr. Ruiz retrieved the trailer key from his passenger door, and thereby impliedly consented to a search of the trailer.  Later, when Defendant unlocked the trailer doors for Officer Chavez and Officer Perea, he impliedly consented to the first search and to his detention during the first search of the trailer. In addition, Defendant voluntarily consented in writing to Officer Chavez's second search of the trailer with canine Chica.[22] Once Chica alerted inside the trailer, and Officer Chavez discovered the marijuana, the officers had probable cause to arrest Defendant.

---

[22] The Court notes, however, that Defendant lacks standing to challenge his consent to the search because he lacks a protected privacy interest in the trailer.  *See infra* discussion on standing.

THEREFORE, IT IS ORDERED THAT the Motion To Suppress is denied.

_____
UNITED STATES SENIOR DISTRICT JUDGE